Jesse C. Swanhuyser (SBN 282186)
jesse@sycamore.law
Kristina M. Hambley (SBN 352499)
kristina@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue
San Francisco, CA 94129
Tel: (415) 360-2962

Attorneys for Plaintiff
SIERRA CLUB

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA CLUB, a public benefit non-profit corporation,<br><br>                              Plaintiff,<br><br>            vs.<br><br>JOHN KENNEY CONSTRUCTION, INC., a California Corporation,<br><br>                              Defendant. | Case No.: 2:25-cv-6141<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br><br>Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387 |

COMPLAINT                                    1

## I. **JURISDICTION AND VENUE**

1.      This is a civil action brought under the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1251 *et seq*.

2.      This Court has subject matter jurisdiction over Sierra Club ("Sierra Club" or "Plaintiff") and John Kenney Construction ("Kenney Construction" or "Defendant") (collectively the "Parties") and over the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

3.      This complaint ("Complaint") seeks relief for ongoing violations by Kenney Construction of the Clean Water Act, and the terms and conditions of the *National Pollutant Discharge Elimination System Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ*, as amended by *Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, Order No. 2014-0057-DWQ,* and as amended on November 6, 2018 ("General Permit"), related to polluted storm water and non-storm water discharges from the industrial facility owned and operated by Kenney Construction at 619 East Montecito Street in Santa Barbara, California ("Facility").

4.      The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration) and 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties).

5.      Prospective citizen plaintiffs must, as a jurisdictional prerequisite to enforcing the Clean Water Act in Federal District court, prepare a Notice of Violation and Intent to File Suit letter ("Notice Letter") containing, *inter alia*, sufficient information to allow the recipient to identify the standard, limitation, or order alleged to be violated, the activity alleged to constitute the violations, the location of alleged violations, and the date or dates of such violations. 33 U.S.C. § 1365(a); 40 C.F.R. § 135.3(a).

6.      The Notice Letter must be sent via certified mail at least sixty (60) days prior to filing a complaint ("Notice Period") to the owner of the facility alleged to be in violation of the Act and, where the alleged violator is a corporation, to the corporation's registered agent for service of process. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(a)(1).

7.      A copy of the Notice Letter must be mailed to the Attorney General, U.S. Department of Justice ("U.S. DOJ"), the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of the U.S. EPA for the region in which a violation is alleged to have occurred, and

1   the chief administrative officer for the water pollution control agency for the

2   State in which the violation is alleged to have occurred. 33 U.S.C. § 1365(b); 40

3   C.F.R. § 135.2(b)(1)(A).

4          8.      On May 1st, 2025, Sierra Club sent a Notice Letter via certified mail

5   to Kenney Construction and its registered agent for service of process. The

6   Notice Letter described ongoing violations of the Act and General Permit at the

7   Facility and provided notice of Sierra Club's intention to file suit against

8   Defendant at the expiration of the Notice Period. A true and accurate copy of the

9   Notice Letter as provided to Kenney Construction is attached to, and

10  incorporated by reference into, this complaint as EXHIBIT 1.

11         9.      The Notice Letter was received by Jonathan Kenney on May 5, 2025

12  (Certified Mailing Receipt No. 95890710527023788327013).

13         10.     The Notice Letter was received by Jordon S. Kenney on May 5,

14  2025 (Certified Mailing Receipt No. 95890071052702378832020).

15         11.     The Notice Letter was received by U.S. DOJ on May 9, 2025

16  (Certified Mailing Receipt No. 95890710527002378832037).

17         12.     The Notice Letter was received by U.S. EPA on May 8, 2025

18  (Certified Mailing Receipt No. 95890710527012378832020).


19

20

COMPLAINT                                    4

13.    The Notice Letter was received by the Regional Administrator for U.S. EPA Region IX on May 5, 2025 (Certified Mailing Receipt No. 9589071052702378832068).

14.    The Notice Letter was received by the Executive Director of the State Water Resources Control Board ("State Board") on May 5, 2025 (Certified Mailing Receipt No. 9589071052702378832044).

15.    The Notice Letter was received by the Executive Officer of the Central Coast Regional Water Quality Control Board ("Regional Board") on May 3, 2025 (Certified Mailing Receipt No. 9589071052702378832051).

16.    More than sixty (60) days have passed since the Notice Letter was served on Kenney Construction, and the State and Federal agencies.

17.    Plaintiff is informed and believes, and thereon alleges, that neither the U.S. EPA nor the State of California has commenced or is diligently prosecuting a court action to redress violations alleged in the Notice Letter and this Complaint.

18.    Sierra Club's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Act. 33 U.S.C. § 1319(g).

19.    Venue is proper in the Central District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

Sierra Club, by and through its counsel, hereby alleges:

## II.  __INTRODUCTION__

20.    This Complaint seeks relief for unpermitted and unlawful discharges of pollutants, polluted storm water, and polluted non-storm water from the Facility to waters of the United States in violation of the Act and General Permit.

21.    Specifically, this Complaint alleges that the Facility has discharged and continues to discharge pollutants to waters of the United States without National Pollution Discharge Elimination System ("NPDES") permit authorization, in violation of section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

22.    With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, like those conducted by Defendant, flow into Santa Barbara's storm drains and contaminate local streams, creeks, rivers, estuaries, harbors, bays, beaches, and coastal waters.

23.    The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks and rivers each year. See, e.g., Steven Bay et al., Study of the Impact of Stormwater Discharge on Santa Monica Bay (1999).

24.    Numerous scientific studies have documented serious health risks to recreational users of Southern California's waters from pollutant-loaded storm

COMPLAINT                                    6

water and non-storm water discharges. See, e.g., Michael K. Stenstrom, Southern California Environmental Report Card: Stormwater Impact 15 (1998); Los Angeles County Grand Jury, Reducing the Risks of Swimming at Los Angeles County Beaches 205 (2000).

25.    A landmark epidemiological study showed that people who swam directly in front of storm drain outlets into Southern California's coastal waters were far more likely to experience fevers, chills, vomiting, gastroenteritis, and similar health effects than those who swam 100 or 400 yards away from the outlets. Robert W. Haile et al., Santa Monica Bay Restoration Project, An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay 5 (1996).

26.    Santa Barbara's waterways—including Mission Creek, La Laguna Creek, Sycamore Creek, beaches, and nearshore coastal waters ("Receiving Waters")—are ecologically sensitive areas, and are essential habitat for dozens of cetacean, pinniped, fish, bird, macro-invertebrate and invertebrate species.

27.    The Receiving Waters include one of Santa Barbara's most popular recreation areas for locals and tourists alike, and as such is a vital social and economic asset for the community.

28.    The Regional Board identifies beneficial uses of the Receiving Waters and establishes water quality standards in the Water Quality Control Plan for the Central Coastal Basin  (June 2019 Edition) ("Central Coast Basin Plan").

29.    Beneficial uses of the Receiving Waters include:

a.    Water Contact Recreation ("REC-1")—"[u]ses of water for recreational activities involving body contact with water, where ingestion of water is reasonably possible," including without limitation swimming, surfing, wading, water-skiing, free diving, SCUBA diving, surfing, and fishing;

b.    Non-Contact Water Recreation—"[u]ses of water for recreational activities involving proximity to water, but not normally involving body contact with water, where ingestion of water is reasonably possible," including without limitation picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepooling, marine life study, hunting, sightseeing, and aesthetic enjoyment; and

c.    Marine Habitat—"[u]ses of water that support marine ecosystems," including without limitation preservation or enhancement of marine habitats, vegetation such as kelp, fish, shellfish or wildlife (e.g., marine mammals, shorebirds). Central Coast Basin Plan §§ 2.2.9, 2.2.10, and 2.2.17.

30.    Industrial facilities, like Defendant's, that discharge storm water and non-storm water contaminated with sediment, toxic metals, trash, and other pollutants to the Receiving Waters contribute to the impairment of surface waters and aquatic dependent wildlife, expose people to biological hazards, and harm locals and visitors alike by impairing beneficial uses, including for Sierra Club members.

31.    Defendant's polluted discharges threaten public health, aquatic ecosystem health and the economic welfare of our community—particularly individuals and businesses that depend on our creeks, beaches, and ocean waters like surfers, fishers, and hotel and tour operators.

32.    The Facility's contaminated discharges can and must be controlled as required by the Clean Water Act for ecosystems to regain their health and to protect public health.

33.    Controlling polluted storm water and non-storm water discharges associated with industrial activity is vital to protecting the Receiving Waters, and essential to Sierra Club's mission.

34.    Defendant is liable under the Clean Water Act for its past and ongoing failures to comply with the Act, including failures to comply with the General Permit's discharge prohibitions, technology-based and water quality-based effluent limitations, planning and monitoring requirements, remedial action

COMPLAINT                                          9

requirements, and other procedural and substantive requirements. *See* 33 U.S.C. §§ 1342, 1365.

35.   Kenney construction is liable for daily, date-specific, monthly, and annual violations of the General Permit since at least May 1, 2025. *See* 33 U.S.C. §§ 1311(a), 1319(d); 40 C.F.R. § 19.4.

## III.   THE PARTIES

### A.   Sierra Club—Santa Barbara-Ventura Chapter

36.   The Sierra Club is America's largest and most influential grassroots environmental organization, with millions of members and supporters. The Santa Barbara-Ventura Chapter of the Sierra Club has hundreds of members and supporters.

37.   In addition to protecting every person's right to get outdoors and access the healing power of nature, the Sierra Club also workers to promote environmental justice, clean energy, safeguard the health communities, protect wildlife, and preserve the remaining wild places through grassroots activism, public education, lobbying, and legal action.

38.   Sierra Club members live, work, and recreate in and around Santa Barbara, including many who live near and/or recreate in and around the Receiving Waters.

39. Sierra Club members use and enjoy the Receiving Waters to fish, surf, swim, sail, SCUBA dive, kayak, view/photograph wildlife, bike, run, hike, walk, and play volleyball.

40. The Facility's unlawful and unpermitted discharge of pollutants into the Receiving Waters, and failure to comply with the General Permit's non-discharge mandates, degrade the quality of the Receiving Waters and pose risks to human health and aquatic life, harming Sierra Club's members and impairing their ability to use and enjoy these waters for recreational, aesthetic, spiritual, and other activities.

41. The interests of Sierra Club and its members, therefore, have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and General Permit.

42. Continuing commission of the acts and omissions alleged herein will irreparably harm Sierra Club and its members, for which harm they have no plain, speedy, or adequate remedy at law.

43. The relief sought herein will redress the harms to Sierra Club caused by Kenney Construction's unlawful activities.

///

///

///

COMPLAINT                                        11

**B.**    **Owner and/or Operator of the Facility**

44.    Kenney Construction incorporated in California on July 12, 1995. The first available Statement of Information filed with California's Secretary of State is dated December 20, 2022.

45.    The company's most recent Statement of Information, filed October 3, 2024, lists the company's principal address as 619 E. Montecito Street, Santa Barbara, California 93103.

46.    The Statement of Information designates Jonathan Kenney as the company's agent for service of process.

47.    According to the company's website, Kenney Construction operates in concrete, drilling, structural steel, and adjacent trades, and regularly installs shoring, soldier piles, micro-piles, helical piers, ground screws, driven piles, tiebacks and bridges while maintaining equipment capable of drilling to depths of over 100 feet and up to 12 feet in diameter.

48.    Kenney Construction owns and operates a 78,400 square foot industrial facility at the 619 E. Montecito Street, Santa Barbara address ("the Facility").

49.    Industrial activities conducted at the Facility include, but are not limited to, handling and storage of industrial materials (including waste materials), and storage, use and maintenance of industrial equipment.

50.    These activities are conducted in both covered and uncovered areas at the Facility.

51.    During storm events, industrial activities occurring in both covered and uncovered areas at the Facility contribute pollutants to storm water that is discharged from the Facility to the Receiving Waters.

52.    Kenney Construction's operations are potentially classified under various Standard Industrial Classification ("SIC") SIC codes, including SIC code 1522 (General Contractors—Residential Building), SIC code 1541 (General Contractors—Industrial Buildings and Warehouses), SIC code 1542 (General Contractors—Non-Residential Buildings), SIC code 3441 (Fabricated Structural Metal), SIC code 3540 (Metal Working Machinery and Equipment), and SIC code 3560 (General Industrial Machinery and Equipment).

53.    Industrial facilities that discharge pollutants to waters of the United States, including "storm water associated with industrial activity," are required to obtain coverage under an NPDES permit, e.g., the General Permit. See 40 C.F.R. § 122.26(A)(1)(ii). To enroll in and obtain coverage under the General Permit, discharges must submit a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board"). General Permit, § I.A.12. Categories of facilities considered to be engaging in industrial activity include, without limitation, those defined in 40 C.F.R. Chapter I, Subchapter N ("Subchapter N"), including Part

450 (construction and development), and facilities assigned SIC code 3540 (Metal Working Machinery and Equipment) and SIC code 3560 (General Industrial Machinery and Equipment). *See* 40 C.F.R. §122.26(b)(14)(i)-(ii).

54.   As of July 7, 2025, publicly available information, including the State Board's online database for NPDES program compliance filings (Storm Water Multiple Application and Report Tracking System ("SMARTS")), indicates that the Facility has never filed an NOI or otherwise enrolled in an NPDES permit since beginning industrial activities.

55.   Storm water discharges containing pollutants from the Facility to the Receiving Waters are unpermitted.

## IV.   LEGAL BACKGROUND

### A.   The Clean Water Act

56.   The Act is the primary federal statute regulating the protection of the nation's water. The Act aims to prevent, reduce, and eliminate pollution in the nation's water in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

57.   "To achieve its objectives, the [A]ct is based on the concept that all discharges into the nation's waters are unlawful, unless specifically authorized by a permit[.]" Congressional Research Service, Report RL30030.

COMPLAINT                                    14

58.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with other enumerated sections of the Act, including prohibition of discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402. Id. §§ 1311, 1342(b); *see also* General Permit, § I.A.12.

59.    The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

60.    Section 402(p) of the Act establishes a framework regulating industrial storm water discharges under federal and authorized state NPDES permit programs. 33 U.S.C. § 1342(p).

61.    Section 402(p) of the Act allows each state to administer an NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water, approved by the U.S. EPA. *Id.* § 1342(p).

62.    States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers. 33 U.S.C. § 1342(b).

1    63.    The relevant NPDES permit in this action is California's General

2  Permit, which is issued by the State Water Resources Control Board ("State

3  Board") and implemented and enforced by Regional Board Water Quality Control

4  Boards, including the Central Coast Water Quality Control Board ("Regional

5  Board").

6    64.    All unpermitted discharges of polluted storm water "associated with

7  industrial activity" are violations of the Act. 33 U.S.C. § 1342(b)(2)(B).

8    65.    Categories of facilities considered to be engaging in industrial activity

9  include, without limitation, those defined Subchapter N, including Part 411, and

10  facilities assigned specified SIC codes, including 3241. See 40 C.F.R. §

11  122.26(B)(14)(i)-(ii).

12    66.    Section 505(a)(1) of the Act provides for citizen enforcement against

13  any "person" who is alleged to be in violation of an "effluent standard or

14  limitation . . . or an order issued by the Administrator or a State with respect to

15  such a standard or limitation." 33 U.S.C. § 1365(a)(1), (f).

16    67.    The Act is a strict liability statute. *NRDC v. Los Angeles County,* 725

17  F.3d 1194, 1204–1205 (9th Cir. 2013); *Baykeeper v. Int'l Metals Ekco, Ltd*., 619

18  F. Supp. 2d 936, 940 (C.D. Cal. 2009), *citing Hawaii's Thousand Friends v. City*

19  *& Cty. of Honolulu,* 821 F. Supp. 1368, 1392 (D. Haw. 1993).

20

COMPLAINT                                16

68.    "Effluent standard or limitation" is defined to include: (a) the prohibition section 301(a) against unpermitted discharges; (b) an ELG prescribed in Subchapter N; and/or (c) a condition of an NPDES permit such as the General Permit. *Id.* §1365(f); *see also id.* §§ 1311(a), 1314(b), 1342.

69.    A "person" under the Act includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. *Id.* § 1362(5).

70.    Each violation of any term or condition in an NPDES permit is an independent violation of the Act. 33 U.S.C. § 1319(d). Each separate violation of the Act subjects the violator to a penalty of up to $64,618.00 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after January 6, 2023. *Id.* §§ 1319(d), 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

71.    Section 505(d) of the Act allows a prevailing or substantially prevailing party to recover litigation costs, including fees for attorneys, experts, and consultants where the court finds that such an award is appropriate. 33 U.S.C. § 1365(d); *see also St. John's Organic Farm v. Gem County Mosquito Abatement Dist.,* 574 F.3d 1054, 1062–64 (9th Cir. 2009) (holding that the court's discretion to deny a fee award to a prevailing plaintiff is narrow, and denial is "extremely rare.").

COMPLAINT                                    17

## B.    EPA-Approved Effluent Limitation Guidelines

72.    Facilities subject to subchapter N must comply with specific EPA approved Effluent Limitation Guidelines ("ELGs") and all federal and state NPDES permits must be conditioned upon compliance with them, unless more stringent requirements apply. 40 C.F.R. §§ 401.10, 122.26(b)(14)(i); *see also* 33 U.S.C. § 1314.

73.    40 C.F.R. Chapter I, Subchapter N defines twelve categories of industry that are subject to specific EPA-approved Effluent Limitation Guidelines ("ELGs").

74.    All qualifying point sources must comply with the ELGs, and all federal and state NPDES permits must be conditioned upon compliance with them, unless more stringent requirements apply. 40 C.F.R. § 401.10*; see also* 40 C.F.R. §§ 122.26(b)(14)(i), 123.25(a)(9).

75.    Attachment A to the General Permit, which defines covered facilities, requires enrollment for all "Facilities Subject To Storm Water Effluent Limitations Guidelines, New Source Performance Standards, or Toxic Pollutant Effluent Standards Found in 40 Code of Federal Regulations, Chapter I, Subchapter N." Subchapter N, Part 450 applies to "Construction and Development Point Source[s]." 40 C.F.R. § 450.10.

*///*

COMPLAINT                                    18

1          **C.    California's General Industrial Stormwater Permit**

2          76.    California is authorized by U.S. EPA to issue NPDES permits for

3   storm water discharges associated with industrial activities. U.S. EPA, *NPDES*

4   *State Program Authority*, https://www.epa.gov/npdes/npdes-state-program-

5   authority (last updated on Jan. 3, 2023); *see* 33 U.S.C. § 1342(b); 40 C.F.R. §

6   122.28(a).

7          77.    The State Board is charged with regulating pollutants to protect

8   California's water resources, Cal. Water Code § 13001, and is designated as the

9   state agency for all purposes stated in the Act, *id.* § 13160(a).

10         78.    In order to discharge storm water lawfully in California, certain

11  categories of industrial dischargers must apply for, and obtain coverage under the

12  General Permit by submitting a Notice of Intent to the State Board, and comply

13  with all of its terms. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1); *see also*

14  General Permit, § I.A.12.

15         79.    The Notice of Intent serves as certification to the State of California

16  that the industrial facility owner(s), operator(s), and/or agent(s) have read the

17  General Permit and will comply with all its terms and conditions.

18         80.    Attachment A to the General Permit, which defines covered facilities,

19  requires enrollment for all "Facilities Subject To Storm Water Effluent

20  Limitations Guidelines, New Source Performance Standards, or Toxic Pollutant

COMPLAINT                                    19

Effluent Standards Found in 40 Code of Federal Regulations, Chapter I,

Subchapter N."

81.    Additionally, facilities undertaking industrial activities classified

under Standard Industrial Classification code 3241 are required to obtain coverage

under the General Permit. General Permit, § I.A.12; General Permit, Attachment

A, § 2.

82.    Compliance with the General Permit constitutes compliance with the

Clean Water Act for purposes of storm water discharges. 33 U.S.C. §

1311(b)(2)(A), (E).

83.    Conversely, "[General] Permit noncompliance constitutes a violation

of the Clean Water Act and the [California] Water Code." General Permit, §

XXI.A; *see also* General Permit, § I.A.8 ("This General Permit authorizes

discharges of industrial storm water [] so long as those discharges comply with all

requirements, provisions, limitations, and prohibitions in this General Permit.").

84.    Permittees that fail to comply with the terms and conditions of the

General Permit, therefore, are liable for violations of the Act. *Nw. Envtl.*

*Advocates. v. City of Portland,* 56 F.3d 979, 986 (9th Cir. 1995) ("[T]he plain

language [of the Act] authorizes citizens to enforce all permit conditions.");

*Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d 1141, 1151 (9th Cir.

2000) (finding that "the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural.").

85.    Industrial facilities discharging storm water without coverage under the General Permit are liable under the Act for unpermitted discharges for every day of significant rainfall.

86.    On information and belief, Kenney Construction does not have and has never had, nor has it ever submitted an application for, a NPDES permit for the discharge of pollutants to waters of the United States. Storm water discharges containing pollutants from the Facility are, therefore, unpermitted.

87.    Kenney Construction is liable for past and ongoing violations of the General Permit, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311(a), 1319(d); *see also* 40 C.F.R. § 19.4.

**D.    The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

88.    The General Permit contains the following three sections restricting the discharge of pollutants in storm water from the Facility: (1) discharge prohibitions; (2) technology-based effluent limitations; and (3) water quality-based effluent limitations.

Discharge Prohibitions

89.    The General Permit's Discharge Prohibitions prohibit any and all

1    discharges of storm water not specifically authorized by the General Permit.

2    General Permit § III.A.

3        90.   The General Permit's Discharge Prohibitions prohibit all "discharges

4    of liquids or materials other than storm water" (e.g., storm water commingled

5    with industrial water residual, industrial particulates, water used for dust

6    suppression, chemical spills, trash) not otherwise authorized by another NPDES

7    permit, either directly or indirectly to waters of the United States. General Permit

8    § III.B.

9        91.   The General Permit's Discharge Prohibitions prohibit any

10   "[d]ischarges that violate any discharge prohibitions contained in [the Central

11   Coast Basin Plan], or statewide water quality control plans and policies." General

12   Permit § III.C.

13       92.   The Central Coast Basin Plan contains the following narrative

14   discharge prohibition applicable to the Facilities: "Waste discharges shall not

15   contain materials in concentrations which are hazardous to human, plant, animal,

16   or aquatic life." Central Coast Basin Plan § 5.4.1 at 261.

17       93.   For purposes of enforcing the General Permit's Discharge

18   Prohibitions, the Water Quality Control Plan for Ocean Waters of California

19   ("Ocean Plan") is a statewide water quality control plan containing restrictions

20   and prohibitions appliable to discharges from the Facilities.

COMPLAINT                                    22

1    94.   The Ocean Plan contains the following narrative discharge

2    prohibitions applicable to the Facilities:

3         a.   "Waste discharged to the ocean must be essentially free of []

4              substances which will accumulate to toxic levels in marine waters,

5              sediments, or biota." Ocean Plan at 13.

6         b.   "The discharge of Trash to surface waters of the State or the

7              deposition of Trash where it may be discharged into surface waters

8              of the State[]." Ocean Plan at 32.

9    95.   The Ocean Plan contains the numeric objectives for the protection of

10   marine ecosystems (see TABLE 2). Ocean Plan Table 3 at 9.

11                             TABLE 2
               "Objectives for Protection of Marine Aquatic Life"

| *Pollutant* | *Numeric Standard (Instantaneous Maximum)* |
|---|---|
| cadmium | 0.01 mg/L (total recoverable) |
| chromium VI | 0.02 mg/L (total recoverable) |
| copper | 0.03 mg/L (total recoverable) |
| lead | 0.02 mg/L (total recoverable) |
| zinc | 0.20 mg/L (total recoverable) |

* - mg/L = milligrams per liter.

16   96.   The Ocean Plan contains the numeric objectives for bacteria in the

17   Receiving Waters (see TABLES 3 and 4). Ocean Plan at 4-5.

18

19

20

COMPLAINT                           23

TABLE 3
California Ocean Plan Standards for Enterococcus

| Pollutant | 6-Week Geometric Mean | Statistical Threshold Value |
|---|---|---|
| Enterococcus | 30 cfu/100 mL | 110 cfu/100 mL |

TABLE 4
California Ocean Plan Standards for Fecal Coliform

| Pollutant | 30-Day Geometric Mean | Single Sample Maximum |
|---|---|---|
| Fecal Coliform[1] | 200 cfu/100 mL | 400 cfu/100 mL |

97.    The General Permit's Discharge Prohibitions prohibit all "[non-storm water discharges] that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of the Water Code. General Permit § III.D.

Technology-Based Effluent Limitations

98.    The General Permit's technology-based effluent limitations (referred to as "Effluent Limitations") require permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of pollution controls that achieve the Best Available Technology Economically Achievable

---

[1] Fecal coliforms are a broad group of bacteria, including Escherichia coli ("E. coli"), found in the intestines of warm-blooded animals that are used as indicators of fecal contamination in water. E. coli is a more specific indicator of recent fecal contamination and human waste.

("BAT") in the industry for toxic or non-conventional pollutants, and the Best

Conventional Pollutant Control Technology ("BCT") for conventional pollutants

(collectively, the "BAT/BCT" standard). General Permit § V.A, Fact Sheet §

II.D.5; *see* 40 C.F.R. §§ 401.15–.16 (listing conventional and toxic/non-

conventional pollutants).

99.   The General Permit's technology-based effluent limitations set the

floor for pollution reduction, i.e., the minimum level of controls that must be

implemented by each permittee facility, regardless of the quality of water to

which a permittee facility discharges. General Permit § V; *see also* General

Permit, Fact Sheet § II.D.31 ("[The Clean Water Act] requires that discharges

from existing facilities must, *at a minimum*, comply with technology-based

effluent limitations based on the technological capability of Dischargers to control

pollutants in their discharges." (emphasis added)).

100.  According to U.S. EPA, According to U.S. EPA, and corroborated by

storm water monitoring data, multiple pollutants discharged and/or emitted (or

potentially discharged/emitted) to the Receiving Waters from the Facilities are

classified as toxic pollutants, including without limitation arsenic, cadmium,

chromium (VI), copper, lead, nickel, and zinc. *See* 40 C.F.R. § 401.15; *see also*

U.S. EPA Industrial Stormwater Fact Sheet Series (available at

https://www.epa.gov/npdes/industrial-stormwater-fact-sheet-series).

101.  Compliance with the General Permit's BAT/BCT obligation requires each permittee to design and implement effective, site-specific pollution control strategies called Best Management Practices ("BMPs").

102.  BMPs are schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the United States. BMPs include treatment systems, operation procedures, and processes to control and abate the discharge of pollutants from the Facility. 40 C.F.R. § 122.2.

103.  Any failure to implement BMPs that meet or exceed the BAT/BCT technology-based standard at each of the Facilities is a violation of the General Permit and Act.

104.  In order to comply with the technology-based effluent limitations (i.e., the BAT/BCT standard) at the Facilities, the General Permit requires Kenney Construction "to implement a set of minimum BMPs." General Permit, Fact Sheet § I.D.1.

105.  Minimum BMPs are typically non-structural (e.g., sweeping, covering industrial pollutant sources, inspections).

106.  Minimum BMPs described in the General Permit include good housekeeping (General Permit § H.1.a), preventative maintenance ((General Permit § H.1.b), spill and leak prevention and response (General Permit § H.1.c),

COMPLAINT                                    26

material handling and waste management (General Permit § H.1.d), erosion and sediment controls (General Permit § H.1.e), employee training program (General Permit § H.1.f), and quality assurance and record keeping (General Permit § X.H.1.g).

107.  Good housekeeping BMPs include, without limitation:

a.  observing all outdoor areas associated with industrial activity, including discharge points and perimeter areas to identify (and clean, remove, dispose of) tracked or leaked materials;

b.  minimize or prevent material tracking;

c.  minimize dust generated from industrial materials or activities;

d.  cover all stored industrial material that can be readily mobilized by contact with storm water;

e.  prevent disposal of any rinse/wash waters or industrial material into the storm water conveyance system;

108.  Preventative maintenance BMPs include, without limitation:

a.  Identify equipment and systems likely to spill or leak pollutants, and conditions that may result in leaks;

b.  Establish an appropriate schedule for observation and maintenance of the identified equipment and systems; and

c.  Establish procedures for prompt maintenance and repair.

109.   Spill and leak prevention and response BMPs include, without limitation:

 a.   Establish procedures and/or controls to minimize spills and leaks;

 b.   Develop and implement spill and leak response procedures to prevent discharges of industrial materials, including specifically prompt clean up and disposal procedures; and

 c.   Identify and describe all necessary spill and leak response equipment, their location and maintenance procedures.

110.   Material handling and waste management BMPs include, without limitation:

 a.   Prevent or minimize handling of industrial materials or wastes that can be readily mobilized by contact with storm water during storm events;

 b.   Contain all non-solid industrial material (e.g., dirt, sand, trash, green waste) or wastes (e.g., trash, green waste wash/rinse water) that can be transported or dispersed by wind or contact with storm water;

 c.   Cover all industrial waste disposal contains and industrial material storage containers when not in use;

 d.   Clean all spills of industrial materials or wastes that occur during handling in accordance with the spill response procedures; and

COMPLAINT      28

e. Observe and clean outdoor material or waste handling equipment or containers that be contaminated by contact with industrial materials or wastes.

111. Erosion and sediment control BMPs include, without limitation:

a. Implement effective wind and erosion controls;

b. Provide effective stabilization for inactive areas, finished slopes, and other erodible areas prior to a forecasted storm event; and

c. Maintain effective perimeter controls and stabilize all site entrances and exits to sufficiently control discharges of erodible materials from discharging or being tracked off the site;

112. Employee training program BMPs include, without limitation:

a. Training employees to implement, *inter alia*, BMP implementation, BMP effectiveness evaluations, visual observations, and storm water sample collection;

b. Provide staff with appropriate training manuals/materials;

c. Establish and implement a training schedule; and

d. Maintain reasonable documentation of trainings.

113. Quality assurance and record keeping BMPs include, without limitation:

a. Develop and implement *management procedures* to ensure that

COMPLAINT                                    29

1  appropriate staff implements *all* elements of the SWPPP;

2  b.  Develop a method of tracking and recording the implementation of

3  BMPs identified in the SWPPP; and

4  c.  maintain the BMP implementation records for a minimum of five (5)

5  years.

6  114.  Failure to implement all minimum BMPs *to the extent feasible* is a

7  violation of this General Permit. General Permit § X.H.1.

8  115.  A permittee that determines it is infeasible to implement minimum

9  BMPs at its site must provide a written justification in the SWPPP. General

10  Permit § X.H.4.b.

11  116.  In cases where minimum BMPs are insufficient in controlling

12  pollutant levels is storm water discharges, compliance with the BAT/BCT

13  standard permittees must implement advanced BMPs. Categories of advanced

14  BMP described in the General Permit include: (1) exposure minimization BMPs

15  (e.g., moving industrial material and equipment indoors), (2) storm water

16  containment and discharge reduction BMPs (e.g., retention basins), (3) treatment

17  control BMPs, and (4) additional advanced BMPs needed to meet the Effluent

18  Limitations. General Permit § X.H.2.b.

19  117.  Kenney Construction's implementation of applicable minimum

20  BMPs, *in combination with* any advanced BMPs, serve as the basis for

COMPLAINT                                30

compliance with this General Permit's technology-based effluent limitations and together must reflect best industry practice considering technological availability and economic practicability and achievability. General Permit, Fact Sheet § I.D.1.

118.   Implementation of minimum BMPs does not represent BAT/BCT for permittees with facility operations cannot feasibly implement sufficient minimum BMPs to *effectively* control pollutant concentrations to levels consistent with the General Permit's Effluent Limitations.

119.  Permittees must provide written justification in its SWPPP when it has determined advanced BMPs may be necessary to reduce pollutant discharge but cannot be implemented because of technological availability and economic practicability and achievability.

120.  The Clean Water Act is a technology-forcing statute. The definition of a technology that is "available" and/or "economically practicable and achievable" will change as new technology is developed and/or the price of existing technology comes down.

121.  Compliance with the General Permit's Effluent Limitations may change with improved technology and industry standards.

122.  Best practices within an industrial category, and/or implemented at similar industrial facilities, are relevant to assessing whether BMPs implemented by Kenney Construction at the Facility comply with the BAT/BCT standard.

COMPLAINT                                        31

123. The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called "benchmarks," which are pollutant concentrations used to assess the effectiveness of pollution controls ("U.S. EPA Benchmarks"). U.S. EPA, National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit (MSGP) for Storm Water Discharges Associated with Industrial Activity § 4.2.2 (as modified Mar. 1, 2021).

124. According to U.S. EPA:

a. U.S. EPA Benchmarks are objective numeric standards for evaluating whether the Best Management Practices designed and implemented at a facility achieve the statutory BAT/BCT standard. *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766–64767 (Oct. 30, 2000); and

b. U.S. EPA Benchmark exceedances are not considered *per se* violations of the statute or permit, but rather "red flags" that point to a problem at the site with exposed pollutant sources or ineffective control measures. *Industrial Stormwater Monitoring and Sampling Guide*, United States Environmental Protection Agency (April 2021) (cited in each of the SWPPPs filed by Kenney Construction in 2025).

125.  In the Ninth Circuit, storm water discharges containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop and implement pollution control strategies that achieve BAT/BCT-level pollutant reductions. *Sierra Club v Union Oil, 813 F.2d 1480, 1493 (9th Cir. 1988) (a permittee's self-reported storm water monitoring data is equivalent to an admission in NPDES enforcement actions); see Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2nd 914, 921–25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also*, General Permit, Fact Sheet § II.K.1.

126.  Table 5 (freshwater) and Table 6 (saltwater) contain some of the U.S. EPA Benchmarks relevant to the assessing Robertsons' compliance with the BAT/BCT standard at the Facilities.

TABLE 5
U.S. EPA Benchmarks for Discharges to Freshwater

| Pollutant | 2015 Benchmark | 2021 Benchmark |
|---|---|---|
| total suspended solids | 100 mg/L[*] | no change |
| aluminum | 0.75 mg/L | 1.1 mg/L |
| iron | 1.0 mg/L | Removed |
| copper[**] | 0.014 mg/L | 0.00519 mg/L |
| lead[**] | 0.082 mg/L | no change |
| zinc[**] | 0.12 mg/L | no change |
| chemical oxygen demand | 120 mg/L | no change |
| pH | 6.0 – 9.0 s.u.[***] | no change |

1   ** - pollutants are dependent on water hardness; value listed based on a hardness

2   of 100 mg/L.

3   *** - s.u. = standard units.

4                                    TABLE 6

    U.S. EPA Benchmarks for Discharges to Saltwater

| Pollutant | 2015 Benchmark | 2021 Benchmark |
|---|---|---|
| total suspended solids | 100 mg/L | no change |
| aluminum | 0.75 mg/L | 1.1 mg/L |
| iron | 1.0 mg/L | removed |
| copper | 0.0048 mg/L | no change |
| lead | 0.21 mg/L | no change |
| zinc | 0.09 mg/L | no change |
| chemical oxygen demand | 120 mg/L | no change |
| pH | 6.0 – 9.0 s.u. | no change |

     127.  The General Permit requires Kenney Construction to evaluate whether

measures to reduce or prevent industrial pollutant loads identified in the Facilities'

SWPPP are adequate and properly implemented.

Water Quality-Based Effluent Limitations

     128.  In addition to complying with the General Permit's technology-based

effluent limitations, permittees are required to meet "any more stringent [water

quality-based limitations] necessary for receiving waters to meet applicable water

quality standards." General Permit, § I.D.31; *see also* 33 U.S.C. § 1311(b)(1)(C).

COMPLAINT                              34

129.  The General Permit's water quality-based effluent limitations, also known as "Receiving Water Limitations," are specifically intended to protect beneficial uses of waters receiving polluted storm water discharges.

130.  Unlike the General Permit's technology-based effluent limitations, Receiving Water Limitations are determined by the status of the receiving surface waters and are designed to protect the designated beneficial uses of those waters.

131.  The General Permit's first Receiving Water Limitation requires Kenney Construction to ensure that industrial storm water discharges from the Facilities do not cause or contribute to an exceedance of any applicable water quality standard in any affected receiving water.

132.  Water quality standards applicable to storm water discharges from the Facilities include without limitation:

a.  the California Toxics Rule (40 C.F.R. 131.38, see also 65 Fed. Reg. 31712 (May 18, 2000)); and

b.  narrative objectives contained in (or amended into) the Central Coast Basin Plan (see e.g., "[w]aste discharges shall not contain materials in concentrations which are hazardous to human, plant, animal, or aquatic life." (§ 5.4.1 at 261)).

COMPLAINT                    35

133.  Storm water discharges with pollutant concentrations that cause or contribute to an exceedance of any applicable water quality standards are violations of the General Permit and the Act.

134.  The California Toxics Rule is a set of water quality standards that apply to all surface waters in California for which a more specific standard (e.g., total daily maximum loads (TMDL), site specific objectives (SSO)) has not been set.

135.  The California Toxics Rule establishes numeric limits for twenty-three (23) priority toxic pollutants calculated to safeguard aquatic organisms and their ecosystems from toxic contamination, and fifty-seven (57) priority toxic pollutants deemed necessary to limit human health risks, particularly for those who consume fish or swim in contaminated waters.

136.  Numeric limits established in the California Toxics Rule that apply to storm water discharges from the Facilities are summarized in Table 7.

TABLE 7
CCTR "End-of-Pipe" Limits

| Pollutant | Freshwater Criteria | Saltwater Criteria |
|---|---|---|
| cadmium | 0.0043 mg/L (dissolved) | 0.042 mg/L (dissolved) |
| chromium VI | 0.016 mg/L (dissolved) | 1.1 mg/L (dissolved) |
| copper | 0.013 mg/L (dissolved) | 0.0048 mg/L (dissolved) |
| lead | 0.065 mg/L (dissolved) | 0.21 mg/L (dissolved) |
| zinc | 0.12 mg/L (dissolved) | 0.09 mg/L (dissolved) |

137.  The California Toxics Rule numeric "standards [] serve as the regulatory basis for the establishment of water-quality-based treatment controls and strategies beyond the technology-based levels of treatment required by sections 301(b) and 306 of the Act." 40 C.F.R. § 131.2.

138.  The General Permit's second Receiving Water Limitation is a narrative standard that requires Kenney to ensure that industrial storm water discharges from the Facilities do not adversely affect human health or the environment.

139.  The General Permit's third Receiving Water Limitation requires Kenney Construction to ensure that industrial storm water discharges from the Facilities do not contain pollutants in quantities that threaten to cause pollution or a public nuisance.

140.  Permittees are required to complete Water Quality Based Corrective Actions when industrial storm water discharges contain pollutant concentrations that violate Receiving Water Limitations. General Permit § XX.B.

141.  Water Quality Based Corrective Actions include without limitation:

   a.  an evaluation of pollutant sources and Best Management Practices implementation;

   b.  assessment of whether additional measures are necessary to reduce or prevent pollutant discharge; and

COMPLAINT                                         37

c.  certification that all additional measures necessary to meet Receiving Water Limitations have been identified and included in the facility's written pollution prevention plan. *See* General Permit § XX.B.1.a–c.

142.  Failure to comply with Water Quality Based Corrective Action requirements is an independent violation of the General Permit. General Permit, Fact Sheet II.E.1.

143.  Compliance with the General Permit's Water Quality Based Corrective Actions is an independent mandate, and does not excuse or otherwise impact a permittee's liability for the underlying violations of the Receiving Water Limitations.

Storm Water Pollution Prevention Plan Requirements

144.  The General Permit requires permittee facilities to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to lawfully continue, industrial activities. General Permit, §§ I.I.54, X.B.

145.  To comply with the General Permit, dischargers must have developed and implemented a SWPPP by July 15, 2015, or upon commencement of industrial activity. *See* General Permit, § X.B.

146. "Failure to develop or implement an adequate [Pollution Prevention Plan], or update or revise an existing [Pollution Prevention Plan] as required, is a violation of this General Permit." General Permit, Fact Sheet § II.I.1.

147. The objectives of SWPPPs are: (1) to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and non-storm water discharges; and (2) to describe and detail site-specific Best Management Practices to reduce or prevent pollutant concentrations in storm water discharges to levels that comply with the General Permit's technology-based and water quality-based effluent limitations. General Permit § X.C.

148. Each SWPPP must include the following elements, among others:

   a. a description of potential pollutant sources;

   b. a narrative assessment of all potential sources of pollution, and identification of pollutants associated with each potential source;

   c. a list of industrial materials handled at the site, the location(s) where each material is stored, shipped, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled;

   d. a site map including all areas of industrial activity subject to the General Permit that depicts the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and

COMPLAINT                                    39

potential pollutant contact, pollutant control measures, and municipal

storm drain inlets that may receive the facility's discharge;

e.  a detailed description of the BMPs developed and implemented;

f.  identification of unauthorized non-stormwater discharges; and

g.  identification of persons and their current responsibilities for

developing and implementing the SWPPP.

149.  The definition of "[s]torm water discharge associated with industrial

activity" includes without limitation:

a.  discharges from industrial plant yards;

b.  discharges from *immediate access roads* traveled by carriers of raw

materials, manufactured products, waste materials, or by-products

used or created by the facility;

c.  discharges from material handling sites, which includes refuse sites,

sites used for the storage and maintenance of material handling

equipment, storage areas for raw materials, and intermediate and final

products (including tank farms); and

d.  discharge from sites used for *material handling activities*, including

specifically for loading/unloading, transportation, and/or conveyance

of any raw material, intermediate product, final product, by-product,

or waste product.

COMPLAINT                                    40

150.  <u>Industrial Processes</u>. Kenney Construction's SWPPPs must include a description of *potential* pollutant sources that includes a description of each industrial process, including manufacturing, cleaning, maintenance, recycling, disposal, generation of by products (including, but not limited to, air particulate emissions), and any other activities related to the process. The following details must be included:

    a.  The type, characteristics, and approximate quantity of industrial materials used in or resulting from the process; and

    b.  Identify and describe areas protected by containment structures and the corresponding containment capacity.

151.  <u>Material Handling and Storage Areas</u>. Kenney's SWPPPs must include a description of *potential* pollutant sources that includes a description of each material handling and storage areas with the following detail:

    a.  the type, characteristics, and quantity of industrial materials handled or stored;

    b.  the shipping, receiving, and loading procedures;

    c.  the spill or leak prevention and response procedures; and

    d.  the areas protected by containment structures and the corresponding containment capacity.

152.  <u>Dust and Particulate Generating Activities.</u> Kenney's SWPPPs must

include a description of *potential* pollutant sources that includes a description of all industrial activities that generate a significant amount of dust or particulate that may be deposited within the facility boundaries.  The following details must be included:

     a.  the discharge locations, the source type, and the characteristics of the dust or particulate pollutant; and

     b.  identify any industrial activities and areas that are associated with other regulations or regulated by other permits (including, but not limited to, air quality permits) with the potential to expose pollutants to storm water.

153.  <u>Erodible Surfaces</u>. Kenney's SWPPPs must include a description of the facility locations where soil erosion may be caused by industrial activity, contact with storm water, authorized and unauthorized NSWDs, or run-on from areas surrounding the facility.

154.  Beyond describing each site's industrial processes, the General Permit requires each SWPPP to contain a narrative assessment of all areas of industrial activity with potential industrial pollutant sources.

155.  Kenney's SWPPPs must include an assessment of the areas of the facility with likely sources of pollutants in storm water discharges.

156.  Kenney's SWPPPs must include an assessment of pollutants likely to

1   be present in industrial storm water discharges.

2        157.  Kenney's SWPPPs must include an assessment approximate quantity,

3   physical characteristics (e.g., liquid, solid, powder) and locations of each

4   industrial material handled, produced, stored, recycled, or disposed.

5        158.  Kenney's SWPPPs must include an assessment of the degree to which

6   the pollutants associated with each site's materials may be exposed to, and

7   mobilized by contact with, storm water.

8        159.  Kenney's SWPPPs must include an assessment of the direct and

9   indirect pathways by which pollutants may be exposed to storm water.

10       160.  Kenney's SWPPPs must include an assessment of all sampling, visual

11  observation, and inspection records.

12       161.  Kenney's SWPPPs must include an assessment of the effectiveness of

13  existing BMPs to reduce or prevent pollutants in industrial storm water

14  discharges.

15       162.  Kenney's SWPPPs must include an assessment of the estimated

16  effectiveness of implementing, to the extent feasible, minimum BMPs to reduce

17  or prevent pollutants in industrial storm water discharges.

18       163.  Kenney's SWPPPs must include an assessment/identification of each

19  site's industrial pollutants related to Receiving Waters' 303(d) listed

20  impairments— enterococcus bacteria, total coliform bacteria, and fecal coliform

COMPLAINT                                        43

bacteria.

164.  Kenney's SWPPPs must identify areas at each of the Facilities where minimum BMPs will not adequately reduce or prevent pollutant in storm water discharges in compliance with Effluent Limitations, and further identify any advanced BMPs for those areas.

165.  Kenney's SWPPP must identify and justify each minimum BMP or applicable advanced BMP *not being implemented* at the Facilities because they do not reflect best industry practice considering technological availability and economic practicability and achievability. General Permit § X.H.4.b.

166.  Each of the industrial processes and all industrial activities undertaken at the Facilities are pollutant sources that must be described and assessed in each SWPPP for their potential contribution of pollutants in storm water discharges. General Permit §§ X.C, X.F, X.G.

Monitoring and Reporting Requirements

167.  Permittees must develop a written plan containing the facility's monitoring and reporting protocols ("Monitoring Implementation Plan") to be included in the SWPPP prior to conducting, and in order to lawfully continue, industrial activities. General Permit §§ X.I, XI.

168.  The objective of the Monitoring Implementation Plan is to detect and measure concentrations of pollutants in a facility's storm water discharges to

assess compliance with the General Permit's substantive requirements, including the technology-based BAT/BCT standards, and water quality-based effluent limitations. General Permit, Factsheet § II.J.1.

169. Information derived from the Monitoring Implementation Plan informs each permittee as to whether it must adapt BMPs design and/or implementation to ensure that storm water and non-storm water discharges comply with the General Permit. General Permit §§ X.I, XI.

170. The Monitoring Implementation Plan is an essential component in the General Permit's mandatory iterative self-evaluation process whereby permittees must implement BMPs contained in the SWPPP, evaluate BMPs effectiveness using visual observation and storm water sampling data, and then revise BMPs as necessary to consistently comply with the General Permit's technology-based and water quality-based effluent limitations. *See* 33 U.S.C. § 1342(a)(2).

171. Permittees that fail to develop and implement an adequate Monitoring Implementation Plan that includes both visual observations and sampling and analysis are in violation of the General Permit. General Permit § II.J.3.

172. All NPDES permits shall contain water quality monitoring requirements sufficient to assure compliance with permit technology- and water quality-based effluent limitations. *See* 33 U.S.C. § 1342(a)(2); 40 C.F.R. § 122.44(i)(1) ("[E]ach NPDES permit shall include . . . monitoring

COMPLAINT                    45

1  requirements . . . to assure compliance with permit limitations.").

2  173.  The General Permit's water quality monitoring provisions require

3  Kenney Construction to collect both quantitative (e.g., storm water sample

4  analyses) and qualitative (e.g., visual observation records) data regarding the

5  quality of water discharged from each of the Facilities.

6  174.  The data collected by Kenney per the General Permit's monitoring

7  provisions are sufficient to determine compliance with Discharge Prohibitions,

8  Effluent Limitations, and Receiving Water limitations at each of the Facilities.

9  General Permit § XI.B; *NRDC v. County of L.A.*, 725 F.3d 1194, 1208 (9th Cir.

10 2013) ("[T]he Clean Water Act *requires* every NPDES permittee to monitor its

11 discharges into the navigable waters of the United States in a manner sufficient to

12 determine whether it is in compliance with the relevant NPDES permit."

13 (emphasis in original)).

14 175.  Except as otherwise specified (e.g., representative sample reduction),

15 the General Permit requires Kenney to collect storm water samples from all

16 location where storm water associated with industrial activity is discharged from

17 each of the Facilities. General Permit § XI.B.4–5.

18 176.  The General Permit requires permittees to collect and analyze storm

19 water samples from two Qualifying Storm Events between July 1 and December

20 31 of each reporting year and two (2) Qualifying Storm Events between January 1

and June 30 of each reporting year. General Permit, § XI.B.2.

177.  A Qualifying Storm Event is a precipitation event that: (a) produces a discharge from at least one drainage area at the permittee facility; and (b) is preceded by forty-eight (48) hours with no discharge from any drainage area. General Permit § XI.B.1.

178.  During a given rain event, different facilities (and even different drainage areas within the same facility) produce discharges at different times based on the facility or drainage area's runoff coefficient, which is the ratio between the amount of precipitation and the amount of runoff (i.e., the amount of rain that must fall for a discharge to occur). Sites with high runoff coefficients (e.g., sites graded towards the discharge location, flat sites covered entirely or almost entirely by impervious surfaces) result in storm water discharges during more limited precipitation than sites with low runoff coefficients. Because a Qualifying Storm Event is defined based on the occurrence of a discharge (and not a specific precipitation amount), sites with high runoff coefficients are more likely to experience Qualifying Storm Events than sites with low runoff coefficients.

179.  The General Permit's sample collection requirements are also based on when the discharge begins. Samples must be collected within four (4) hours of the start of a discharge during Scheduled Facility Operating Hours, or the start of facility operations if the Qualifying Storm Event occurs within the 12-hour period

1   prior to business hours. General Permit § XI.B.5.

2       180.  The General Permit requires permittees to analyze samples for, among

3   other parameters:

4       a.  conventional pollutants (pH, total suspended solids, and either total

5          organic carbon or oil and grease) (§ XI.B.6.a–b);

6       b.  facility-specific pollutants potentially present in storm water

7          discharges identified through a detailed pollutant source description

8          and evaluation process (§§ X.G.2.d,  XI.B.6.c);

9       c.  Standard Industrial Classification code-based parameters listed in the

10        General Permit at Table 1, such as nitrate plus nitrite ("N+N") for

11        Standard Industrial Classification Code 1442 and iron for Standard

12        Industrial Classification Code 3271 (§ XI.B.6.d);

13       d.  parameters related to receiving waters with 303(d) listed impairments,

14        or approved Total Maximum Daily Loads; and

15       e.  Regional Board-mandated parameters, which are any additional

16        pollutants identified by the relevant Regional Board (§ XI.B.6.f).

17      181.  The General Permit requires permittees to submit all sampling and

18   analytical results for every sample via the State Board's online reporting system

19   within thirty (30) days of obtaining each analytical report from a certified

20   laboratory. General Permit § XI.B.11.a.

COMPLAINT                     48

182.  The General Permit requires Kenney Construction to conduct visual observations of storm water discharges *at least* every month, and at the same time sampling occurs at each discharge location. General Permit § XI.A.1-2.

183.  Records of visual observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, or odor, and identify the source of any pollutants. General Permit § XI.A.2.

184.  The General Permit requires Kenney to document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants observed in storm water discharges. General Permit § XI.A.3.

185.  Visual observations are a form of water quality monitoring, and records maintained by Kenney Construction are relevant to assessing compliance with the General Permit at each of the Facilities, including without limitation compliance with the BAT/BCT standard.

Numeric Action Levels and Exceedance Response Actions

186.  The General Permit requires permittees to take corrective action in response to monitoring data that demonstrates that pollutant concentrations in storm water discharged from its facility exceed Numeric Action Levels ("NALs"). General Permit, § XII.

COMPLAINT                                   49

187.  Annual NALs are similar to, and derive from, U.S. EPA Benchmarks. General Permit, Fact Sheet, § I.D. Some of the annual Numeric Action Levels applicable to the Facility are summarized in Table 8.

TABLE 8
Numeric Action Levels Applicable to the Facilities' Discharges

| POLLUTANT | ANNUAL NAL |
|-----------|------------|
| TSS | 100 mg/L |
| copper | 0.0332 mg/L |
| lead | 0.262 mg/L |
| zinc | 0.26 mg/L |
| N+N | 0.68 mg/L |

188.  A Numeric Action Level exceedance occurs when the average of all sampling data for a given pollutant from a reporting year exceeds the Numeric Action Level assigned to that pollutant, i.e. if the average concentration from three samples of zinc is 0.52 mg/L (e.g., 0.26 mg/L, 0.52 mg/L, and 0.78 mg/L). General Permit § XII.A.1.

189.  Numeric Action Level exceedances operate as a signal to owners/ operators, state agencies, and the public that a permittee's Best Management Practices are ineffective at preventing/limiting pollutant loading in storm water discharges, and therefore immediate remedial actions are required. General Permit § XII.A.

190.  The Numeric Action Levels "are not intended to serve as technology-

based or water quality-based numeric effluent limitations. The [Numeric Action Levels] are not derived directly from either BAT/BCT requirements or receiving water objectives. [Numeric Action Levels] exceedances defined in this General Permit are not, *in and of themselves*, violations of this General Permit." General Permit § I.N.77 (emphasis not in original).

191.  "[O]ne single NAL exceedance for a particular [pollutant] is not a clear indicator that a facility's discharge is out of compliance with [TBELs]." 2015 Permit, Fact Sheet § II.K.1. Repeated NAL exceedances orders of magnitude above the level for the same parameter over many years at different discharge points can establish a violation of the General Permit technology-based BAT/BCT standard.

192.  The Numeric Action Levels are NOT General Permit compliance standards for Kenney Construction's Facilities.

193.  The General Permit requires a permittee with Numeric Action Level exceedance(s) to develop and implement remedial measures called "Exceedance Response Actions" ("ERA"). General Permit, § XII.

194.  The first time a permittee's storm water sampling data demonstrates an exceedance of a Numeric Action Level, its compliance status changes from Baseline to Level 1 on July 1 following the reporting year during which the exceedance(s) occurred. General Permit § XII.C.

195.  At Level 1 status, a permittee must: evaluate and revise, as necessary, its Best Management Practices with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP") by October 1; and submit an Exceedance Action Report prepared by the Qualified Industrial Stormwater Practitioner by January 1. General Permit § XII.C.

196.  A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 Exceedance Response Action report has been completed, all identified additional Best Management Practices have been implemented, and results from four (4) consecutive subsequent qualified storm events sampled indicate no additional NAL exceedances for that parameter. General Permit § XII.C.2.b.

197.  A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a Numeric Action Level exceedance for that same parameter while the Discharger is in Level 1. Level 2 status will commence on July 1 following the reporting year during which the additional Numeric Action Level exceedance(s) occurred. General Permit § XII.D.

198.  Dischargers with Level 2 status must certify and submit a Level 2 Exceedance Response Action Plan prepared by a Qualified Industrial Stormwater Practitioner that addresses each new Level 2 Numeric Action Level exceedance by January 1 following the year Level 2 status is assigned. General Permit §

COMPLAINT                                      52

XII.D.1.a.

199.  All elements of the Level 2 Exceedance Response Action Plan must be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 Exceedance Response Action Plan. General Permit § XII.D.1.d.

200.  On January 1 of the year following the submittal of the Level 2 Exceedance Response Action Plan, the discharger with Level 2 status must certify and submit a Level 2 Exceedance Response Action Technical Report prepared by a Qualified Industrial Stormwater Practitioner. General Permit § XII.D.2.

201.  Permittees with Level 2 status that submit required documentation and have implemented BMPs to prevent future NAL exceedance(s) for the Level 2 parameter(s) may return to baseline status for that parameter, if results from four (4) subsequent consecutive Qualifying Storm Event sampled indicate no additional NAL exceedance(s) for that parameter(s).

202.  Compliance with the General Permit's Exceedance Response Action processes (i.e., analyses and pollution control enhancements) triggered by entering Level 1 or Level 2 status is mandatory. General Permit § I.N.76, Fact Sheet § K.2.b ("[I]t is a violation of the permit [] to fail to comply with the Level 1 status and Level 2 status ERA requirements in the event of [] exceedances.")

203.  However, compliance with the Exceedance Response Action

requirements does not shield a permittee from liability for violations of the General Permit's technology-based or water quality-based mandates and does not excuse past or ongoing violations of the General Permit's pollution prevention mandates.

204.  Data from samples collected during a Qualifying Storm Event occurring outside of Scheduled Facility Operating Hours are valid for all purposes under the General Permit, including to demonstrate compliance with the NALs and return to Baseline status.

### E.    Water Quality Based Corrective Actions

205.  Permittees are further required to complete Water Quality Based Corrective Actions when monitoring data demonstrates that pollutant concentrations in storm water violate Receiving Water Limitations. General Permit, § XX.B.

206.  Water Quality Based Corrective Actions include without limitation:

1) an evaluation of pollutant sources and Best Management Practices implementation;

2) assessment of whether additional measures are necessary to reduce or prevent pollutant discharge; and

3) certification that all additional measures necessary to meet Receiving Water Limitations have been identified and

COMPLAINT                                    54

1   included in the facility's Pollution Prevention Plan. *See*

2   General Permit, § XX.B.1.a–c.

3   207.  Failure to comply with Water Quality Based Corrective Action

4   requirements is an independent violation of this General Permit. General Permit,

5   Fact Sheet II.E.1.

6   208.  Compliance with the General Permit's Water Quality Based

7   Corrective Actions is an independent mandate, and does not shield a permittee

8   from liability for violations of the General Permit's technology-based or water

9   quality-based mandates, nor excuse past or ongoing violations of the General

10  Permit's pollution prevention mandates.

11  **F.    The General Plan's Annual Comprehensive Facility Compliance**

12  **Evaluation Requirement**

13  207.  Kenney Construction must complete an Annual Comprehensive

14  Facility Compliance Evaluation ("Annual Compliance Evaluation") for each

15  Reporting Year. General Permit, § XV.

16  208.  The goal of the Annual Compliance Evaluation is to ensure and

17  certify compliance with each of the General Permit's other mandates.

18  209.  The Annual Compliance Evaluation must include, at a minimum:

19  a.  a review of all sampling, visual observation, and inspection records

20  conducted during the previous year;

COMPLAINT                              55

b.  an inspection of all areas of industrial activity and associated pollutant sources for evidence of pollutants entering the storm water conveyance system;

c.  an inspection of all drainage areas previously identified as having no exposure to industrial activities;

d.  an inspection of equipment needed to implement Best Management Practices;

e.  an inspection and evaluation of all Best Management Practices for proper design, implementation, and adequate reduction/prevention of pollutants in storm water discharges;

f.  a determination of whether additional Best Management Practices are needed to comply with the General Permit; and

g.  an assessment of any other factors needed to comply with the requirements of Section XVI.B (Annual Report mandates). General Permit § XVI.

210.  The General Permit requires permittees to submit a Compliance Checklist with each Annual Report that contains the following:

a.  an indication of whether the permittee complies with, and has addressed all applicable requirements of, the General Permit;

b.  an explanation for any noncompliance with requirements within the

COMPLAINT                                          56

1              Reporting Year, as indicated in the Compliance Checklist;

2         c.  an identification, including page numbers and/or sections, of all

3              revisions made to the Pollution Prevention Plan within the Reporting

4              Year; and

5         d.  the date(s) of the annual Compliance Evaluation.

## STATEMENT OF FACTS

### A. The Facility

209.  Kenney Construction is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

210.  Kenney Construction is the legally responsible operator of the 74,804 square foot Facility located at 619 E. Montecito Street, Santa Barbara, California 93103.

211.  Industrial activities conducted at the Facility include, but are not limited to handling and storage of industrial materials (including waste materials), and storage, use and maintenance of industrial equipment.

212.  These activities are conducted in both covered and uncovered areas at the facility.

213.  Each industrial process undertaken by Kenney Construction at the Facility, including without limitation those industrial activities described in

COMPLAINT             57

1  paragraphs 166-170, has the potential to generate pollutants that will contaminate

2  its storm water discharges.

3      214.  During storm events, these accumulations of dust and particulate are

4          discharged as dissolved and suspended pollutants in storm water flow into a

5  municipal storm drain, from which they are conveyed to the nearshore waters of

6  East Beach and the Pacific Ocean.

7      215.  Therefore, the Facility is a "point source" of pollution as defined in

8  section 502(14) of the Clean Water Act, 33 U.S.C. section 1642(14), and section

9  122.2 of Title 40 of the Code of Federal Regulations.

10      216.  The nearshore waters of East Beach and the Pacific Ocean are waters

11  of the United States.

12      217.  Based on Sierra Club's investigation—including extensive internet

13  research, field visits, storm water discharge observation, sampling, and analysis,

14  and an evaluation of satellite imagery—storm water containing pollutants is

15  discharged from the Facility to the Receiving Waters without coverage under the

16  General Permit or an individual NPDES permit.

17      218.  As of the date of this Complaint, Kenney Construction has not filed

18  an NOI to enroll in the General Permit.

19      219.  As of the date of this Complaint, Kenney Construction does not have

20  NPDES permit coverage for its discharges.

220.  Every day that the Facility discharges storm water without permit coverage is a separate and distinct violation of the Act.

221.  Accordingly, Kenney Construction is liable for violations of the Act and General Permit's Discharge Prohibitions for unpermitted discharges on each day of significant rainfall since at least May 1, 2020.

222.  These violations are ongoing, and Sierra Club will include additional violations as information becomes available.

223.  Even if Kenney Construction obtains General Permit coverage during the pendency of Sierra Club's enforcement action, industrial operations at the Facility will continue to be in violation of the General Permit's effluent limitations and other conditions as described below.

**B. Sierra Club's Storm Water Sample Collection and Analysis**

224.  On January 22, 2024, Sierra Club sampled storm water at the Facility.

225.  Sierra Club's analysis of those samples documents storm water discharges from the Facility containing the following pollutants: TSS, aluminum, copper (total and dissolved), and zinc (total) (SEE TABLE 5).

/ / /

/ / /

/ / /

/ / /

COMPLAINT                                      59

TABLE 5
SUMMARY OF STORM WATER SAMPLE ANALYSIS

| Date | Pollutant | Result | CTR Criteria | U.S. EPA Benchmark | Discharge Point |
|---|---|---|---|---|---|
| | | ### = exceeds one or more numeric standards | | | |
| Jan. 22, 2024 | Total Suspended Solids | 190 mg/L | n/a | 100 mg/L | S13 (East Montecito St.) |
| | Oil and Grease | ND mg/L | n/a | 15 mg/L | |
| | Aluminum (Total) | 7.16 mg/L | n/a | 1.1 mg/L | |
| | Copper (Total) | 0.035 mg/L | n/a | 0.0048 mg/L | |
| | Copper (Dissolved) | 0.018 (J) | 0.0048 mg/L | n/a | |
| | Lead (Total) | ND | n/a | 0.21 mg/L | |
| | Lead (Dissolved) | ND | 0.21 mg/L | n/a | |
| | Zinc (Total) | 0.177 mg/L | n/a | 0.09 mg/L | |
| | Zinc (Dissolved) | 0.014 (J) | 0.09 mg/L | n/a | |

226.  The storm water sample collected by Sierra Club at the Facility on January 22, 2024 contained concentrations of TSS at 190 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for TSS.

227.  The storm water sample collected by Sierra Club at the Facility on January 22, 2024 contained concentrations of Aluminum (total) amounting to 7.16 mg/L, which exceeds the 1.1 mg/L U.S. EPA Benchmark for Aluminum (total).

228.  The storm water sample collected by Sierra Club at the Facility on January 22, 2024 contained concentrations of Copper (total) at 0.035 mg/L which exceeds the 0.0048 mg/L U.S. EPA Benchmark and NAL for Copper (total).

229.  The storm water sample collected by Sierra Club at the Facility on January 22, 2024 contained concentrations of Copper (dissolved) at 0.018 (J) which exceeds the 0.0048 mg/L CTR Criteria for Copper (dissolved).

230.  The storm water sample collected by Sierra Club at the Facility on January 22, 2024 contained concentrations of Zinc (total) at 0.177 mg/L which exceeds the 0.09 mg/L U.S. EPA Benchmark for Zinc (total).

### C. The General Permit and the Facility

231.  The Facility has no NPDES Permit coverage for its discharges.

232.  The NPDES Permit applicable to the Facility is the General Permit.

233.  Even if the Facility obtains General Permit coverage, it will be in violation of the effluent limitations and requirements of the General Permit, as described below.

### 1.  Discharge Prohibitions

234.  Sierra Club's sampling data, document review, and visual observations establish that Kenney Construction has violated and continues to violate the General Permit Discharge Prohibitions.

235.  Specifically, Kenney Construction discharges storm water in violation of the terms of the General Permit by discharging material other than storm water and violated statewide water quality control plans and policies.

236.  These violations are ongoing, and Sierra Club will include additional violations when information becomes available.

### 2.  BAT/BCT and Best Management Practices

237.  On information and belief, Kenney Construction has failed to implement minimum and advanced Best Management practices employed by similar industrial facilities representing BAT/BCT.

238.  Sierra Club's investigation—including without limitation numerous "drive by" inspections from the public right of way—confirm that Kenney Construction has failed to implement even minimum required BMPs, *e.g.*, good housekeeping, and is in ongoing violation of BAT/BCT requirements.

239.  Each day that Kenney Construction operates the Facility without BMPs achieving BAT/BCT-level pollutant reductions is a separate and distinct violation of the General Permit's technology-based mandates and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

240.  Kenney Construction is liable for violation of related remedial mandates on an ongoing basis.

241. These violations are ongoing, and Sierra Club will include additional violations when information becomes available.

### 3. Receiving Water Limitations

242. Based on Sierra Club's examination of water quality monitoring data and in-person observations at the Facility, Kenney Construction has violated and continues to violate the General Permit's Receiving Water Limitations. General Permit § VI.A–C.

243. Storm water sampling data collected by Sierra Club at the Facility on January 22, 2024 indicate that concentrations of copper exceeded the CTR "end of pipe" numeric limits (see TABLE 3).

244. Sierra Club's storm water sampling data and in person observations establish that the Facility is causing and/or contributing to violations of applicable WQSs in violation of the General Permit's Receiving Water Limitation. General Permit § VI.A–C.

### 4. SWPPP Requirements

245. Based on Sierra Club's investigation, Kenney Construction has failed to develop or implement a SWPPP prior to conducting industrial activities, in violation of the General Permit.

COMPLAINT                                          63

246.  Every day the Facility operates with an inadequately developed, implemented, and/or properly revised SWPPP is a separate and distinct violation of the General Permit and Act.

247.  Kenney Construction has been and remains in daily violation of the General Permit's SWPPP requirements since at least May 1, 2020. Civil penalties and injunctive relief are available remedies for these violations. 33 U.S.C. §§ 1311, 1342.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Comply with Duty to Apply for an NPDES Permit in Violation of the Clean Water Act (33 U.S.C. §§ 1311, 1342)**

248.  Sierra Club re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

249.  Kenney Construction is a "person" within the definition of section 502(5) of the Act and 40 C.F.R. § 122.2.

250.  The Facility is a "point source" of pollution as defined in section 502(14) of the Act and 40 C.F.R. § 122.2.

251.  Stormwater discharged by Kenney Construction meets the definition of a "pollutant" contained in section 502(6) of the Act and 40 C.F.R. § 122.2.

252.  Kenney Construction's discharges of storm water are "discharges of a pollutant" as defined in Section 502(12) of the Act and 40 C.F.R. § 122.2.

253.  Any person who discharges pollutants and does not have an effective permit to discharge pollutants to waters of the United States must submit an application for an NPDES permit. 40 C.F.R. § 122.21(a).

254.  Sierra Club is informed and believes, and therein alleges, that Kenney Construction has not applied for an NPDES permit authorizing the discharge of polluted storm water to waters of the United States.

255.  Each day that Kenney Construction has operated and continues to operate without submitting an application for an NPDES Permit for the discharge of pollutants to waters of the United States is a separate and distinct violation of Section 301(a) of the Act.

256.  Kenney Construction has been in violation of the Act for operating without applying for an NPDES permit every day since at least May 1, 2020.

257.  Kenney Construction's daily violations of the Act are ongoing.

258.  An action for injunctive relief under the Clean Water Act is authorized by section 505(a) of the Act.

259.  Continuing commission of the acts and omissions above alleged would irreparably harm Sierra Club members and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

260.  WHEREFORE, Sierra Club prays judgment against Kenney Construction as set forth hereafter.

COMPLAINT                                        65

## SECOND CAUSE OF ACTION

### Unpermitted Discharges of Pollutants to Waters of the United States in Violation of the Clean Water Act (33 U.S.C. §§ 1311, 1342)

261.  Sierra Club re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

262.  All unpermitted discharges of polluted storm water "associated with industrial activity" are violations of the Act. 33 U.S.C. § 1342(b)(2)(B).

263.  Storm water containing pollutants is discharged from the Facility on every day of significant rainfall.

264.  Every day that the Facility discharges storm water without permit coverage is a separate and distinct violation of the Act.

265.  Kenney Construction has been in further violation of the Act for discharging storm water without a permit on every day of significant rainfall since May 1, 2020. 33 U.S.C. §§ 1311(a).

266.  Kenney Construction's date-specific violations of the Act are ongoing.

267.  An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the Act.

268.  Continuing commission of the acts and omissions alleged above would irreparably harm Sierra Club and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

269.  WHEREFORE, Sierra Club prays judgment against Kenney Construction as set forth hereafter.

## THIRD CAUSE OF ACTION
### Discharge of Contaminated Storm Water in Violation of the General Permit's Technology-Based Effluent Limitations and the Act

270.  Sierra Club re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

271.  Based on Sierra Club's examination Kenney Construction has failed, and continues to fail, to reduce or prevent pollutants associated with industrial activities from being discharged to waters of the United States through the implementation of Best Management Practices at the Facility that achieve the technology-based BAT/BCT treatment standards.

272.  Sierra Club's January 22, 2024 sampling and analysis of storm water discharging from Kenney Construction's facility demonstrates discharges of storm water from the Facility contain concentrations of pollutants that exceed the BAT/BCT level of control.

273.  Kenney Construction's failures to develop and/or implement Best Management Practices that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility are violations of the General Permit's technology-based effluent limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

274.  Kenney Construction violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Facility.

275.  Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

276.  Kenney Construction's violations of the General Permit's technology-based effluent limitations and the Act are ongoing and continuous.

277.  Kenney Construction is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 1, 2020, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

278.  An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Sierra Club and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

279.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

COMPLAINT                                    68

1    WHEREFORE, Sierra Club prays for judgment against Kenney

2  Construction set forth hereafter.

### FOURTH CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Permit's Water Quality-Based Effluent Limitations and the Act (General Permit Conditions and 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

280.  Sierra Club re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

281.  Sierra Club's January 22, 2024 sampling and analysis of storm water at Kenney Construction's facility demonstrate the existence of discharges of contaminated storm water from the Facility containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards in violation of the General Permit's water quality-based effluent limitations. *See* General Permit, § VI.A.

282.  Sierra Club's January 22, 2024 sampling and analysis of storm water discharging from Kenney Construction's facility demonstrate that the Facility has discharged contaminated storm water from the Facility containing levels of pollutants that adversely impact human health and the environment in violation of the General Permit's water quality-based effluent limitations. *See* General Permit, § VI.B.

COMPLAINT                                  69

283.  Sierra Club's January 22, 2024 sampling and analysis of storm water discharging from Kenney Construction's facility demonstrate that the Facility has discharged contaminated storm water containing levels of pollutants that threaten to cause pollution or a public nuisance in violation of the General Permit's water quality-based effluent limitations. See General Permit, § VI.C.

284.  Violations of the General Permit's water quality-based effluent limitations are ongoing and continuous.

285.  Each and every violation of any of the General Permit's water quality based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

286.  Every day, since at least May 1, 2020, that Kenney Construction has discharged polluted storm water from the Facility in violation of the General Permit's water quality-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. See 33 U.S.C. § 1311(a).

287.  Kenney Construction is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 1, 2020 to the present, pursuant to sections 309(d) and 505 of the Act. See 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

288.  An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions

alleged above would irreparably harm Sierra Club and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

289.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Sierra Club prays for judgment against Kenney Construction as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update An Adequate Storm Water Pollution Prevention Plan
### (General Permit Conditions and 33 U.S.C. §§ 1311, 1342)

290.  Sierra Club re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

291.  Kenney Construction has not developed and implemented a legally adequate Pollution Prevention Plan for the Facility, including failing to comply with those requirements detailed in paragraph 148 of this Complaint.

292.  Kenney Construction's violations of the General Permit's Pollution Prevention Plan requirements are ongoing and continuous.

293.  Each day since May 1, 2020, that Kenney Construction has not developed, implemented, and reviewed and updated a legally adequate Pollution

1   Prevention Plan for the Facility is a separate and distinct violation of the General

2   Permit and the Act. 33 U.S.C. § 1311(a).

3       294.  Kenney Construction has been in violation of the General Permit's

4   Pollution Prevention Plan requirements every day since May 1, 2020. Violations

5   continue each day that an adequate Pollution Prevention Plan for the Facility is

6   not developed and fully implemented.

7       295.  Kenney Construction is subject to an assessment of civil penalties for

8   each and every violation of the Act occurring from August 21, 2018, to the

9   present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d),

10  1365; 40 C.F.R. § 19.4.

11      296.  An action for injunctive relief is authorized by section 505(a) of the

12  Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions

13  alleged above would irreparably harm Sierra Club and the residents of the State of

14  California, for which there is no plain, speedy, or adequate remedy at law.

15      297.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

16  because an actual controversy exists as to the rights and other legal relations of the

17  Parties.

18      WHEREFORE, Sierra Club prays for judgment against Kenney

19  Construction as set forth hereafter.

20  ///

COMPLAINT                                    72

## SIXTH CAUSE OF ACTION

**Failure to Develop and Implement An Adequate Monitoring Implementation Plan**

**(General Permit Conditions and 33 U.S.C. §§ 1311, 1342)**

298.  Sierra Club re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

299.  Kenney Construction has failed to collect storm water samples as required by the General Permit, including without limitation failing to collect sufficient samples during qualifying storm events during the 2019–2020, 2020–2021, 2021–2022, 2022–2023, and 2023–2024 permit years.

300.  Kenney Construction has failed to comply with the General Permit's Water Quality Based Corrective Actions. General Permit § XX.B.

301.  Kenney Construction has not developed and implemented a legally adequate monitoring and reporting program, or Monitoring Implementation Plan, for the Facility.

302.  Kenney Construction's violations of the General Permit's Monitoring Implementation Plan mandate are ongoing and continuous.

303.  Each day since May 1, 2020, that Kenney Construction has not developed and implemented a lawful Monitoring Implementation Plan for the Facility and all areas of industrial activity in violation of the General Permit is a

COMPLAINT                                        73

separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

304.  Kenney Construction is subject to an assessment of civil penalties for each and every violation of the Act occurring from August 21, 2018 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

305.  An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Sierra Club and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

306.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Sierra Club prays for judgment against Kenney Construction as set forth hereafter.

///

///

///

///

///

COMPLAINT                                    74

## **RELIEF REQUESTED**

WHEREFORE, Sierra Club respectfully requests that this Court grant the following relief:

     a.  Declare Kenney Construction to have violated, and to be in violation of, the General Permit and Act as alleged herein for its unpermitted discharges of pollutants;

     b.  A court order declaring Kenney Construction to have violated and to be in violation of Section 301(a) of the Act for discharging pollutants in violation of a permit issued pursuant to Section 402 of the Act, and for failing to comply with the substantive and procedural requirements of the Industrial Storm Water Permit;

     c.  A court order requiring that the Kenney Construction apply for and obtain coverage under the General Permit for the discharges of pollutants as required by Section 301(a) of the Act;

     d.  Enjoin Kenney Construction from discharging polluted storm water form the Facility except as authorized by the General Permit;

     e.  Order Kenney Construction to immediately implement storm water pollution control technologies and measures that achieve BAT/BCT-level pollutant reductions, and that prevent pollutants in the Facility's

COMPLAINT                75

storm water discharges from contributing to violations of any water quality standards;

f.  Order Kenney Construction to prepare a Pollution Prevention Plan consistent with the General Permit's requirements, and implement procedures to regularly review and update the Pollution Prevention Plan to ensure ongoing compliance with Pollution Prevention Plan requirements;

g.  Order Kenney Construction to prepare a Monitoring Implementation Plan consistent with the General Permit's requirements, and comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

h.  Order Kenney Construction to pay civil penalties of up to $64,618.00 for each violation alleged herein pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1.4;

i.  Order Kenney Construction to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

COMPLAINT                                    76

1        j.  Award Sierra Club's costs (including reasonable investigative,

2            attorney, witness, compliance oversight, and consultant fees) as

3            authorized by the Act, 33 U.S.C. § 1365(d); and,

4       k.  Award any such other and further relief deemed appropriate by the Court.

6  DATED: July 7, 2025

7

                                      Respectfully Submitted,

8

9                          By:    */s/ Jesse C. Swanhuyser*

                                    Jesse C. Swanhuyser

10                                 SYCAMORE LAW, INC.

                                 Attorney for Plaintiff

11

12

13

14

15

16

17

18

19

20

COMPLAINT                                77